UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| THOMAS EARL MARTIN, III, | ) | Civil Action No.: 4:09-cv-0589-TLW-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| WYNDHAM VACATION RESORTS; | ) | |
| WYNDHAM WORLDWIDE CORP.; | ) | |
| WYNDHAM HOTELS AND RESORTS; | ) | |
| and WYNDHAM VACATION | ) | |
| OWNERSHIP, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

In his Complaint (Document # 1) and Amended Complaint (Document # 22)[1] (which the court will construe as a supplement to his original Complaint), Plaintiff, who is proceeding pro se, alleges claims arising out of his employment with Defendant Wyndham Vacation Resorts (WVR). Although not explicitly set forth, Plaintiff appears to assert causes of action for retaliation for reporting sexual harassment in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. and retaliation for reporting "shareholder fraud, faulty numbers and

---

[1]Plaintiff previously filed two Motions to Amend his Complaint, asking to add additional attachments to his Amended Complaint and to add a clause seeking injunctive relief. The undersigned entered an Order (Document # 83) granting the Motions to Amend "provided Plaintiff files one complete, second Amended Complaint in compliance with this Order within ten days of the date of this Order." Order at 6. Plaintiff filed a document (Document # 85) entitled "Amend Complaint and Claim for Injunctive Relief" that is far from compliant with the Order. Thus, the undersigned directed the Clerk of Court's office to file the document as a "Response" to the Order and the Court will not treat the filing as an Amended Complaint. The Motions to Amend (Documents # 50, 53) are denied for failure to comply with the Order (Document # 83).

predatory lending," which this court will construe as falling under the Sarbanes-Oxley Act of 2002 (SOA), 18 U.S.C. § 1514A.[2]

Presently before the Court are Plaintiff's Motion for Summary Judgment (Document # 64), Defendants' Motion for Summary Judgment (Document # 69), and Plaintiff's Second Motion for Summary Judgment (Document # 90). Because Plaintiff is proceeding pro se, he was advised pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), that a failure to respond to Defendants' Motion for Summary Judgment could result in the Motion being granted. Plaintiff timely filed a Response (Document # 79) to Defendants' Motion. Defendants have also filed Responses (Documents # 65, 91) to Plaintiff's Motions. All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(e), DSC. Because the Motions for Summary Judgment are dispositive motions, this Report and Recommendation is entered for review by the district judge.

## II.     FACTS

### A.     Plaintiff's Employment With WVR

Defendant WVR hired Plaintiff on April 20, 2007, as an exit representative at its site in North

---

[2]In Plaintiff's Motion for Summary Judgment and his Response to Defendants' Motion for Summary Judgment, Plaintiff appears to raise additional claims. However, these claims are not properly before the Court. See Bridgeport Music, Inc. v. WM Music Corp., 508 F.3d 394, 400 (6th Cir.2007) (holding that a party may not expand its claims to assert new theories in response to summary judgment); White v. Roche Biomedical Labs., Inc., 807 F.Supp. 1212, 1216 (D.S.C.1992) (noting that "a party is generally not permitted to raise a new claim in response to a motion for summary judgment"). Additionally, on March 16, 2009, Plaintiff filed a second charge of discrimination with the South Carolina Human Affairs Commission alleging retaliation and discrimination on the basis of race, sex, age and disability. Pl. Dep., Ex. 32. However, Plaintiff does not raise allegations of race, sex, age or disability discrimination in his Complaint, and, thus, any claims of discrimination on those bases are not properly before the court either.

Myrtle Beach. Pl. Dep., Ex. 7 (attached as Ex. 1 to Defendants' Motion). As a condition of his employment, Plaintiff signed a Salesperson Agreement ("Agreement"), which provides, in part, that Plaintiff was an at-will employee and that he "may be promoted, demoted, or transferred to one or more positions within WVR, and may work at one or more locations, during the terms of [his] employment." Pl. Dep., Ex. 8, ¶ 1. Paragraph two of the Agreement provides that Plaintiff would be paid commissions on the sales of WVR's products and that WVR retained the exclusive right to revise or replace the commission schedule from time to time at its discretion. Pl. Dep., Ex. 8, ¶ 2. The Agreement further provides that in the event of a rescission or cancellation of a sales contract, commissions would be subject to adjustment and/or refund to WVR. Id.

Plaintiff also signed the "Strictly Prohibited Conduct" policy which prohibited, among other actions, "[t]ampering with or falsification of Company records, systems, or documents, including but not limited to, applications of employment, time records, expense reports, guest tour codes, or phone systems." Pl. Dep., Ex. 15.[3]

Plaintiff received an employee handbook at the start of employment which he acknowledged receiving and agreed that he was an at-will employee and that WVR had the right, in its sole discretion, to manage his performance or to impose corrective action, i.e., verbal or written warning, or suspension, in any given situation. Pl. Dep., Ex. 13 and Ex. 14.

## B.    Sales Representatives' Compensation

Sales representatives at WVR, such as Plaintiff, have several components of their compensation which include the following:

---

[3]When shown a copy of this warning at his deposition, Plaintiff testified that he did not think this was the document he had signed and that "the signature on there could or could not be mine." Pl. Dep. 130:25-131:2.

- "Steady Pay" to help representatives through the initial "ramp-up" phase;

- "Base Commissions" on the net qualified sales which are paid bi-weekly;

- "Monthly Hurdle Bonus" which is paid each month to qualified sales representatives according to the preset hurdles based on either volume or close/rate efficiency;

- "Annual Bonus" which may be provided for achieving specific net sales volume hurdles.

Pl. Dep., Ex. 16.

### C.    Plaintiff's Work as an Exit Representative

Exit representatives sell discounted-price products, such as every other year timeshare packages, to prospective customers who have declined to purchase full price packages. The Company uses a sales rotation method, known as a "power line" to determine the order in which sales representatives are given the opportunity to present to prospective customers. The order in which sales representatives are placed on the power line is determined by their closing percentages; thus the more successful sales representatives are at the top of the power line and the less successful ones are towards the bottom.  Pl. Dep. 110:23-112:20; 126:20-127:1.  Exit representatives receive a 6% commission on timeshare sales, except for podium sales in which they receive a 4% commission, and are eligible for a monthly bonus based on meeting preset hurdles. Pl. Dep., Ex. 17.

Soon after commencing work, Plaintiff observed what he believed was "unethical conduct" by some of his co-workers. For example, as early as May 1, 2007, Plaintiff thought that two team leaders in the Exit Department, who lived together, were manipulating the power line in order to save for themselves the more desirable prospects. Pl. Dep., Ex. 18. Plaintiff anonymously reported these two employees through the Company's hotline for having an inappropriate sexual relationship

-4-

and for manipulating the power line to their advantage. Pl. Dep. 125:18-126:4. Plaintiff submits the Affidavit of Kenneth Gore, a sales representative with WVR in North Myrtle Beach and Las Vegas. Gore Aff. ¶ 2. He avers that he witnessed exit sales team leaders Johnny Acee and Frankie Atwood, who lived together, manipulate the power line in an attempt to save for themselves the more desirable prospects. Id. at ¶ 4 Plaintiff also submits the Affidavit of Christopher William Martin, his brother and a former sales representative of Wyndham Worldwide in North Myrtle Beach. C. Martin Aff. ¶ 2. He avers generally that he has knowledge of personal relationships between female employees and male managers at Wyndham. C. Martin Aff. ¶ 6. He avers that, "without a doubt the Wyndham male superiors violated the Employee Policy Handbook page 17 personal relationships section." Id.; see also Gore Aff. ¶ 8.

Plaintiff also claims other sales representatives were engaging in unethical behavior, what he terms "predatory lending," by asking customers to date and sign credit applications, after which the sales representatives would complete the remainder of the application based on previously obtained information from the customers. See generally, Pl. Dep. 114:11-121:12. Plaintiff believes this practice is "predatory" because it was possible for representatives to falsify the applications by placing incorrect information on the applications to increase the chance of approval, thus increasing their potential commissions. Id. When asked if he had ever heard a manager direct a sales representative to falsify information on a credit application, Plaintiff responded that he had only heard managers tell representatives to "do what it takes to make the sale." He further admitted that he never heard any manager direct representatives, including himself, to falsify any information on the credit applications, and admitted that customers are given copies of their completed credit applications. Pl. Dep. 102:23-103:17; 104:15-17; 105:3-14. Christopher Martin avers that he has

personal knowledge of Wyndham employees violating "Wyndham Sales Compliance such as structuring Bank of America down payment assistance . . . . Wyndham superiors directly instructed me to pitch rental and investment during the sales process." C. Martin Aff. ¶ 2. He also avers that he had knowledge of Wyndham sales managers coach frontline sales employees to structure information on the customer RCI/BOA credit applications. C. Martin Aff. ¶ 4. Gore avers that frontline sales employees were encouraged "to request that customers sign and date only the customer credit applications" and that sales managers coached frontline sales employees to structure information on the customer credit applications. Gore Aff. ¶ 5.

One important aspect of the sales function of any timeshare sales team is to obtain referrals from current prospects of friends or family who might be interested in timeshare products. In early July 2007, it was discovered that Plaintiff had included four names on a referral sheet that were false—a serious violation of Company business principles as well as the Strictly Prohibited Conduct Policy. Pl. Dep., Ex. 21. Plaintiff made no comments on the warning nor reported anything to human resources. However, he claimed in his deposition that he falsified the referrals because his manager at the time directed him to do so. Pl. Dep. 128:19-129:2.

On July 14, 2007, WVR promoted Plaintiff to the position of senior exit representative. As a senior exit representative, Plaintiff's commission rate was increased from six to ten percent and he was also eligible to receive what is called a "TO Commission" of 1.5 percent on sales that he helped other exit representatives close. Pl. Dep., Ex. 22. A senior exit representative is also eligible to receive a monthly bonus but the hurdles are higher and the percentages are less than for an exit representative. Id.

-6-

### D.     Plaintiff's Complaint Regarding His July Bonus

Bonuses are paid on a monthly basis on sales from the first day through the last day of the month. Different levels of employees have different sales hurdles to meet in order to qualify for a bonus and there are several levels of hurdles which enable sales representatives to qualify for a progressively high bonus percentages.  Pl. Dep., Ex. 17 and Ex. 22.  Higher-level salespeople have higher hurdles to meet for their bonuses than do lower-level sales people. Id.  As a senior exit representative, Plaintiff was eligible for a monthly bonus ranging from one to five percent on sales for the month.  Pl. Dep., Ex. 22.

When Plaintiff received his bonus for July 2007, he believed he had been shorted several thousand dollars because he thought his monthly bonus should have been prorated between the percentage exit representatives are eligible to receive and the percentage senior exit representatives are eligible to receive, since his promotion occurred during the middle of the month. See generally, Pl. Dep. 132:20-133:9.  According to Company policy, monthly bonuses are calculated on the last day of the month for sales for the entire month based on the bonus plan in effect for the sales representative on the last day of the month. Warner Aff. ¶ 3 (attached as Ex. 2 to Defendants' Motion).  The Company does not prorate bonuses when a sales representative's bonus plan is switched in the middle of the month. Id.

Furthermore, Plaintiff believes that WVR intentionally did not pay him the correct bonus amount in retaliation for his complaint about the two exit team leaders engaging in an inappropriate relationship and manipulating the power line.  Pl. Dep. 133:23-134:3. Plaintiff testified that he asked both his manager as well as the site's Director of Sales, Rodney Capps, about his bonus payment but never received an adequate answer. Plaintiff then complained to human resources which, according

-7-

to documents created at the time, informed him that they had investigated and had determined that he had been paid correctly.[4] Warner Aff., Ex. A.

      **E.**    **Plaintiff's Transfer to Las Vegas**

On August 31, 2007, John Waller ("Waller"), the Vice President of Sales, and Rodney Capps ("Capps"), the Director of Sales, met with the exit team to begin a series of training to enhance the effectiveness of sales presentations. Warner Aff., Ex. A. Plaintiff believes that Waller stalked and harassed him during this training by standing by his table and listening to his sales presentation. Pl. Dep. 139:11-22; 140:14-20. After the meeting, several employees complained to Waller that Plaintiff had exhibited a very negative attitude to them about the training and had told them that "no one is going to tell me how to do my sales presentation and if this is the way it is going to be then I want a transfer." Warner Aff., Ex. A.

After hearing these complaints regarding Plaintiff's attitude, Waller and Capps met with him the next day, September 1, to discuss his negative attitude and his seeming refusal to follow the preferred sales pitch. Warner Aff., Ex. A. When Waller told Plaintiff that he was not doing the sales presentation as Waller had requested, Plaintiff told him if that was what he wanted him to do, he needed to put it in writing. Pl. Dep. 140:16-20. During the meeting, Plaintiff's attitude remained hostile and Waller believed it best that Plaintiff leave for the day and return after the Labor Day holiday to discuss the issues further. Warner Aff., Ex. A; Pl. Dep. 140:15-20. Plaintiff asserts that

---

    [4]In early 2008, Plaintiff filed a complaint with the South Carolina Department of Labor, Licensing and Regulation ("LLR") claiming that he had not been paid the correct bonus for July 2007. After investigating, LLR determined Plaintiff had been paid correctly and closed his case as "unfounded." Warner Aff. ¶ 5, Ex. C. Plaintiff continued to complain to his managers and human resources that he had been shorted his July 2007 bonus and even included this claim in a subsequent complaint he filed with the Nevada Labor Commissioner later in 2008.

he was suspended for three days for no apparent reason.  Plaintiff's Motion for Summary Judgment (Document # 64) p. 2.

A short while later, Plaintiff contacted human resources and reported that Waller had suspended him when he asked to transfer and requested that updated sales numbers be added to his file. Warner Aff., Ex. A. In a conversation on September 4 with Lance Dawson, the Regional Human Resources Manager, Plaintiff told him that he would like to remain with the Company and possibly transfer to Las Vegas or Orlando. Warner Aff., Ex. A.

On September 5, Plaintiff met again with Waller, Capps, and Dawson. During this meeting, both Plaintiff and Waller signed the transfer authorization form for Plaintiff to transfer to Las Vegas and human resources told Plaintiff they would help him find a position there. Pl. Dep. 149:1-5; Ex. 24.  Plaintiff asserts that Waller and Capps and Dawson demanded that Plaintiff transfer to another sales location if he wanted to continue his employment with Defendants.  Plaintiff's Motion for Summary Judgment (Document # 64) p. 2.  However, when asked at his deposition if he had thought about transferring prior to the meeting with Waller and Capps, Plaintiff replied "I was exploring my options because I was not getting any kind of answers. I was being ignored about the reduction in pay." Pl. Dep. 155:15-20. When asked if he had ever talked to human resources about transferring prior to the meeting with Capps and Waller on September 5, Plaintiff responded that "I do not remember. I know that I was really really facing a lot of harassment with the reduction in pay and I was asking what my options were at that point."[5] Pl. Dep. 154:15-23.

After that meeting on September 5, Plaintiff did not return to work in Myrtle Beach but he

---

[5]In a letter to the EEOC dated July 15, 2008, Plaintiff wrote that "I requested to transfer to Las Vegas in order to tie in my natural business market top marketing and sales contacts to Wyndham ownership points." Pl. Dep., Ex. 27.

did work with Kris Peterson, the Human Resources Director, who assisted him in completing the transfer request form and in contacting several people in Las Vegas to set up interviews. According to Peterson, Plaintiff told her that he did not want to work anymore in Myrtle Beach and was packing and moving to Las Vegas within days of the meeting with Waller and Capps. Warner Aff., Ex. B. In fact, Plaintiff moved the week after the meeting on September 5 without receiving confirmation that his transfer had been accepted by Las Vegas. Id.; Pl. Dep. 160:10-11.

### F.     Plaintiff's Allegations of Sexual Harassment

On September 29, 2007, Plaintiff began working at WVR's Harrah's site in Las Vegas as a sales representative in the Discovery Department. Pl. Dep., Ex. 25; Pl. Dep. 163:23-25; 164:2-5. Discovery representatives sell less expensive non-ownership packages to customers but still receive commissions and are eligible for monthly bonuses. Pl. Dep. 164:3-5. According to Plaintiff, things went very well at Harrah's for about forty-five days until he started witnessing female employees becoming upset. Pl. Dep. 166:3-167:10. For example, Plaintiff claims that he heard female employees were claiming that a certain male employee had sexually assaulted them and that another male employee had "several relationships going on with frontline female employees." Pl. Dep. 166:14-168:12. Plaintiff does not claim to have personally observed these acts, however.

Plaintiff did report that he had seen a male co-worker, Ken Gray, "rubbing the buttocks of another female co-worker and making comments leading towards sex." Pl. Dep. 168:14-18. Human resources investigated Plaintiff's allegations and discovered that Gray and the female coworker, Gina Jones, were close family friends and that they often hugged and kissed each other in greeting. Hama Aff. ¶ 3 (attached as Ex. 3 to Defendants' Motion). Both Gray and Jones were instructed that their actions could make other employees feel uncomfortable and they agreed to stop the behavior. Id.

-10-

Plaintiff was informed that the investigation was completed and he confirmed that the behavior had stopped. Id.

### G.    Plaintiff's Complaint Regarding His February Bonus

In March 2008, Plaintiff reported that he did not believe that he had been paid the correct bonus for February. Pl. Dep. 177:14-20.  Plaintiff based this belief on a report he saw on on March 11, 2008 indicating that he had a higher closing rate for February than he was credited with having when his bonus was paid. Pl. Dep. 177:14-20.  Plaintiff also complained that he thought it was inappropriate that he was being charged back for commissions on sales he made in Myrtle Beach that had rescinded. Pl. Dep. 187:10-188:3.  Human resources investigated and determined that according to written company policy, final bonus reports are prepared on the 15th of the month and if Plaintiff had seen a report on the 11th, it had to have been some other type of report or a preliminary report. Hama Aff. ¶ 4; Ex. A.  Human resources determined that Plaintiff had been paid the correct bonus based on the March 15 Bonus Report and also reminded him that the Sales Agreement that Plaintiff signed at the start of his employment directly stated that "in the event of a rescission or cancellation of a sales contract, commissions would be subject to adjustment and/or refund to WVR."[6]

### H.    Plaintiff's First Charge of Discrimination

On April 22, 2008, Plaintiff filed a charge of employment discrimination with the Nevada Equal Rights Commission against Defendant Wyndham Vacation Ownership (WVO) alleging retaliation for reporting Ken Gray for sexual harassment. Pl. Dep., Ex. 26.  In the charge Plaintiff claims that after he reported Gray for sexual harassment, the Company retaliated against him by

---

[6]Plaintiff filed a wage complaint with the Nevada Labor Commissioner regarding these claims. At the time Defendants filed their Motion, the complaint was still pending with the Nevada Labor Commissioner.

paying him "compensation below the base rate for no reason." Id.  The Company responded to Plaintiff's charge and the Nevada Equal Rights Commission, at Plaintiff's request, issued Plaintiff a Notice of Right to Sue on December 8, 2008.

**I.    Plaintiff's Second Warning**

In July 2008, several co-workers reported to human resources that Plaintiff's behavior had become very confrontational, argumentative, and demeaning and that he was creating a hostile work environment for them.  Pl. Dep., Ex. 28.  On July 22, Plaintiff was given a warning regarding his behavior towards his co-workers and Plaintiff agreed that he did get frustrated when he did not receive resolutions to his inquiries but that he would work on his behavior and would apologize to his peers.  Id.

**J.    Plaintiff's Request to Transfer to a Non-Smoking Facility**

Plaintiff testified that beginning in late April or early May, 2008, he verbally requested to transfer to a smoke-free environment because he believed the smoke at Harrah's was making his asthma worse. It was not until August 2, 2008, however, that Plaintiff sent an e-mail to Louise Johnson, Regional Human Resources Director, stating his desire to transfer from Harrah's to Grand Desert. Notably in that e-mail, Plaintiff did not mention his asthma but requested to transfer to Grand Desert because he feared retaliation if he remained in the Discovery Department at Harrah's. Johnson Aff. ¶ 4; Ex. B (attached as Ex. 4 to Defendants' Motion). On August 11, Plaintiff sent an e-mail to Johnson stating he was "seeking a transfer into the DEED and TITLE Department at Grand Desert," and that his doctor had said that he needed to work in a smoke-free environment because of his asthma.  Id.,

¶ 5; Ex. A. Johnson replied stating there was no such department entitled "DEED and TITLE," but

-12-

attached a request for accommodation which she instructed Plaintiff to complete if he was asking for a transfer due to a medical condition.  Id.

On August 12, Plaintiff replied to Johnson's earlier e-mail regarding the department he was asking to transfer to stating "Ownership department NOT disco." Id., ¶ 6; Ex. A. "Disco" is the shortened named used for the Discovery Department. Johnson informed Plaintiff that there was no such department named "ownership," but both frontline and in-house sales positions were available and Plaintiff replied that either would be suitable.  Id.  On August 21, Plaintiff sent Johnson an e-mail stating that his doctor had completed the Accommodation Request Form and that either frontline or in-house positions were acceptable to him. Id., ¶ 7; Ex. A.

Once the transfer paperwork was completed and Grand Desert had approved his transfer, Plaintiff started work at Grand Desert on September 17, 2008 as a frontline sales representative.  Pl. Dep. Ex. 30. Although Plaintiff specifically requested in the e-mail to Johnson on August 12 that he did not want a position in the Discovery Department, Plaintiff now claims that he was denied a discovery representative job at Grand Desert and a female employee, who was having an affair with her manager, was given a job as a discovery representative a few weeks later. Pl. Dep. 208:22-209:15.

### K.    Plaintiff's Request to Transfer to South Carolina

Shortly after his daughter was born in November 2008, Plaintiff decided that he wanted to return to South Carolina for what he claimed was a "family emergency." Pl. Dep. 209:19-22. When asked what the emergency was, Plaintiff responded "[m]y daughter was just born and my wife, my fiancée, my partner, she was on bed rest and I had asthma. So I needed family to help me take care of her, my newborn, as my condition was getting worse due to stress, induced, it was stress-induced

-13-

asthma."[7]  Pl. Dep. 217:5-12.  When questioned further, Plaintiff admitted that his wife was no longer on bed rest once his daughter was born but that she did not have a lot of energy and was tired and needed help.  Pl. Dep. 218:10-16.  Plaintiff also testified that he needed to get out of the stressful environment in Las Vegas that was made worse when WVR transferred Rodney Capps from Myrtle Beach to Las Vegas.  Pl. Dep. 220:21-221:17.  Plaintiff had Capps sign the transfer authorization form but neglected to have human resources in Las Vegas sign it and also failed to have the department manager or VP of Sales in Myrtle Beach and the human resources representative in Myrtle Beach sign and approve his request. Pl. Dep., Ex. 31.

The transfer policy as explained in the Employee Handbook provides that "[e]mployees who meet the minimum requirements under "Job Posting" may request consideration to transfer to jobs as vacancies become available and will be considered along with other applicants." Pl. Dep., Ex. 14 at p.2. According to both the transfer authorization form and the job posting requirements in the Employee Handbook, for employees to be eligible for transfer they must first (1) meet performance standards in their current position, (2) not be on any level of formal corrective action within the last six months, and (3) have been in their current position for a minimum of six months.  Id. at p.1; Pl. Dep., Ex. 31. The handbook form further provides that "[a]n employee requesting transfer between site locations must obtain formal approval from the Senior Manager at your current work site and the Human Resources Director/Manager assigned to the site prior to being considered by another

---

[7]Plaintiff had informed his doctor on September 24, 2008, that his asthma had significantly improved after moving to a smoke-free environment and there are no other records from his doctor after this date in which Plaintiff reported his asthma as getting worse. Pl. Dep. 235:9-19. When questioned at his deposition as to why he said he needed to transfer because his asthma was getting worse, Plaintiff replied, contradicting his earlier testimony just pages earlier, that "I never mentioned that I transferred for asthma. I needed help with my newborn." Pl. Dep. 236:4-10.

site. Completion of the Transfer Authorization Form is required to document the approval and establish the earliest date that you would be available for transfer to the new site." Pl. Dep., Ex. 14. The Transfer Authorization Form requires that "[t]he completion of a Transfer Authorization Form is required and must be signed by the employee's current supervisor. The form must be returned to the Recruiter of the Human Resources representative responsible for assisting the site or department in filling the job of interest prior to being considered for the transfer or promotion." Pl. Dep., Ex. 31. The Transfer Authorization Form requires approval and signatures of the employee, and the current department manager or VP of Sales and the human resources manager at the recruiting site as well as the recruiter of human resources representative and the department manager or Site VP of Sales at the receiving site. Id.

Plaintiff was well aware of the transfer requirements because he had transferred twice already and knew that the request to transfer had to be approved by not only his current manager, but also the human resources manager at his current site and both the department manager and human resources at the receiving site. Pl. Dep. 199:11-22. Plaintiff, however, for whatever reasons, failed to complete these steps. Pl. Dep., Ex. 31. Instead of obtaining the required signatures, he faxed a copy of the incomplete transfer authorization form, signed only by Capps, to the discovery manager in Myrtle Beach requesting "transfer due to family emergency." Pl. Dep. 210:20-2; Ex. 31. According to Plaintiff, the discovery manager told him to "come in as soon as I get back," and Plaintiff merely assumed from this statement that his transfer had been accepted, without ever receiving the required signatures and approvals. Pl. Dep. 210:22-23. Without completing the process or waiting for any further guarantee, Plaintiff packed up his family and returned to Myrtle Beach.

When Bryant Evans, the Vice President of Sales in Myrtle Beach, learned that Plaintiff was attempting to transfer from Las Vegas to Myrtle Beach, he knew that he could not accept the transfer because the Company was in the midst of a hiring and transfer freeze. Evans Aff. ¶ 7 (attached as Ex. 5 to Defendants' Motion). During the fall and winter of 2008, WVR had had to lay off over 4,000 employees in response to the economic downturn and had instituted a hiring and transfer freeze in order to reduce costs. Id. ¶ 7. Furthermore, to Evans' knowledge, Plaintiff had not contacted him or human resources in Myrtle Beach as required by the Company transfer policy, and without the approval by human resources in Myrtle Beach, Plaintiff could not be accepted for transfer even if there had not been an ongoing transfer freeze. Id. ¶¶ 4, 5 and 6. Also, according to Company policy, Plaintiff was not eligible for transfer because he had not been in his current position for six months and had received a corrective action within the last six months.

Evans immediately called Plaintiff, who was at that time driving his family from Las Vegas to Myrtle Beach, and informed him that Myrtle Beach could not accept his transfer request because of the ongoing hiring and transfer freeze. Pl. Dep. 222:3-7; Evans Aff. ¶ 8. Had Plaintiff followed through with the required transfer process, he would have learned before he started moving himself and his family to Myrtle Beach that he was not eligible to transfer and that there was a hiring and transfer freeze in place. Plaintiff disputes that there was a hiring freeze because a month later two other employees from Las Vegas, Rodney Capps and James Jones, transferred to Myrtle Beach. Pl. Dep. 222:9-10. Capps and Jones, however, transferred pursuant to a Company-wide reorganization. In early 2009, there was a Company-wide reorganization which required many management level employees to accept lower-level positions in order to keep their employment. Evans Aff. ¶ 9. As a result of this reorganization, some employees who had been forced to step down from their current

positions were transferred to other offices, including Capps and Jones.  Evans Aff. ¶ 9.  Plaintiff's

employment with WVR was terminated on December 2, 2008 after the Company determined he had

abandoned his job by moving back to Myrtle Beach. Warner Aff. ¶ 6.

     **L.**     **Plaintiff's Second Charge of Discrimination**

     On March 16, 2009, Plaintiff filed a second charge of discrimination with the South Carolina

Human Affairs Commission alleging retaliation and discrimination on the basis of race, sex, age and

disability. Pl. Dep., Ex. 32. The EEOC administratively closed Plaintiff's file and issued him a

Notice of Right to Sue on December 3, 2009.

**III.**     **STANDARD OF REVIEW**

     The moving party bears the burden of showing that summary judgment is proper.  Summary

judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to

judgment as a matter of law.  Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Summary judgment is proper if the non-moving party fails to establish an essential element of any

cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317.

Once the moving party has brought into question whether there is a genuine dispute for trial on a

material element of the non-moving party's claims, the non-moving party bears the burden of coming

forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita

Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party

must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could

reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and

inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party.

Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may not rely

on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.

Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324.  Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

### A.    Plaintiff's Claims

As noted in the Introduction, Plaintiff's claims are not well-pleaded.  However, he states at the beginning of his Statement of Claim section, "I experienced retaliatory discrimination for reporting sexual harassment and shareholder fraud, faulty numbers and predatory lending at Wyndham Vacation Resorts."  Complaint p. 3.  He then sets forth factual allegations regarding the sexual harassment and other wrongful behavior he reported as well as the discrimination he suffered in retaliation for making such reports.  Id. at pp. 3-7.  At the end of his Statement of Claim section, Plaintiff asserts that "[t]his practice of ignoring the inquiries contributed to reduced income which also appears to be part of Wyndham's overall pattern of **retaliatory discrimination**."  Id. at p. 7.  Accordingly, the undersigned will read Plaintiff's pro se Complaint as alleging causes of action for retaliation for reporting sexual harassment in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e)

-18-

et seq. and retaliation for reporting "shareholder fraud, faulty numbers and predatory lending," which this court will construe as falling under the Sarbanes-Oxley Act of 2002 (SOA), 18 U.S.C. § 1514A.[8]

### B.     Retaliation for Reporting Sexual Harassment

In his Complaint, Plaintiff alleges that in December of 2007, he "reported Ken Gray [Discovery Rep] for direct and indirect sexual harassment" and he also "reported Paul Herman for making rude and offensive jokes leading toward sex."  Complaint p. 5.  He further alleges that he reported "additional sexual discrimination complaints" to Director Steve Wilson and former acting VP Steve Cohen. Id. at p. 7.  He also sets forth the various acts of retaliation he suffered as a result of reporting the sexual harassment.

Title 42, Section 2000e-3(a) of the United States Code provides, in relevant part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) she engaged in protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action.  Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985); Laughlin v. Metropolitan

---

[8]Plaintiff does not set forth in his Complaint, the legal theories under which he is bringing his claim.  Nevertheless, retaliation for reporting sexual harassment is made unlawful under Title VII, see 42 U.S.C. § 2000e-3(a), and the SOA protects employees who work for publicly-traded companies from retaliation for reporting alleged violations of mail, wire, bank or securities fraud; violations of rules or regulations of the Securities and Exchange Commissions; or federal laws relating to fraud against shareholders. See 18 U.S.C. § 1514A(a).  In their Motion for Summary Judgment, Defendants address Plaintiff's claims under these federal statutes without objection by Plaintiff.

Washington Airports Authority, 149 F.3d 253, 258 (4th Cir. 1998). If Plaintiff establishes a prima facie case, Defendants can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. At that point, Plaintiff has the opportunity to prove that Defendants' legitimate, non-retaliatory reason is pretextual. See Matvia v. Bald Head Island Management, 259 F.3d 261, 271 (4th Cir. 2001).

Defendants assert that Plaintiff did not engage in protected activity and, thus, cannot make a prima facie showing of retaliation. To establish "protected activity" Plaintiff must show he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring. Bigge v. Albertsons, Inc., 894 F.2d 1497, 1503 (11th Cir.1990); see also Ross, 759 F.2d at 355 n. 1 (stating that a Title VII oppositional retaliation claimant need not show that the underlying claim of sexual harassment was in fact meritorious in order to prevail). "The inquiry is therefore (1) whether [plaintiff] 'subjectively (that is, in good faith) believed' that the [defendant] had engaged in [an illegal practice], and (2) whether this belief 'was objectively reasonable in light of the facts,' a standard which we will refer to as one of 'reasonable belief.'" Peters v. Jenney, 327 F.3d 307 (4th Cir. 2003)(citing Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1312 (11th Cir.2002)).

In his deposition, Plaintiff testified that after he began working at Harrah's in Las Vegas, he started witnessing female employees becoming upset. Pl. Dep. 166:3-167:10. Plaintiff claims that he heard female employees were claiming that a certain male employee had sexually assaulted them and that another male employee had "several relationships going on with frontline female employees." Pl. Dep. 166:14-168:12. However, Plaintiff does not claim to have personally observed these acts. Further, other than the bald, conclusory allegations in his Complaint, Plaintiff does not present evidence that he ever reported these complaints to anyone. Thus, Plaintiff fails to show that

-20-

he opposed any unlawful employment practice with respect to these facts.

Plaintiff did report that he had seen a male co-worker, Ken Gray, "rubbing the buttocks of another female co-worker and making comments leading towards sex." Pl. Dep. 168:14-18. Human resources investigated Plaintiff's allegations and discovered that Gray and the female coworker, Gina Jones, were close family friends and that they often hugged and kissed each other in greeting. Hama Aff. ¶ 3. Both Gray and Jones were instructed that their actions could make other employees feel uncomfortable and they agreed to stop the behavior. Id. Plaintiff was informed that the investigation was completed and he confirmed that the behavior had stopped. Id.

In addressing a retaliation claim based upon a report of alleged sexual harassment, the Supreme Court reiterated that sexual harassment is actionable under Title VII, and, thus, an unlawful employment practice,  "only if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." Clark County School District v. Breeden, 532 U.S. 268, 270, 121 S.Ct. 1508, 1509 (2001) (internal citations omitted) (quoting Faragher v. Boca Raton, 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). See also Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 752, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (Only harassing conduct that is "severe or pervasive" can produce a "constructive alteratio[n] in the terms or conditions of employment"); Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (Title VII "forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment"). "Courts determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

-21-

offensive utterance; and whether it unreasonably interferes with an employee's work performance."

Jordan v. Alternative Resources Corporation, 458 F.3d 332, 339 (4th Cir. 2006) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)) (internal quotation marks omitted). The Supreme Court has stated that "[a] recurring point in [our] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 524 at 788 (citation and internal quotation marks omitted).

The facts in the record are insufficient to show that the incident witnessed by Plaintiff, that is, Mr. Gray rubbing the buttocks of Ms. Jones and making comments with sexual innuendo, was so severe and pervasive that it created a hostile work environment for the victim, Ms. Jones.[9] Plaintiff has presented insufficient evidence as to the frequency of the conduct, its severity, whether it was physically threatening or humiliating, or whether it unreasonably interfered with Ms. Jones' work performance. As noted by the Court in Clark, "[n]o reasonable person could have believed that the single incident recounted above violated Title VII's standard." Clark, 532 U.S. at 271. In fact, the only evidence in the record regarding Ms. Jones' reaction to this behavior is the Affidavit from the Human Resources Manager for Harrah's in Las Vegas, in which she states that her investigation into Plaintiff's complaint revealed that the conduct was consensual. Based upon the record presented, Plaintiff fails to show that the conduct he reported amounts to an unlawful employment practice under Title VII. As such, he fails to establish a prima facie case of retaliation because he fails to show that he engaged in protected activity. Therefore, it is recommended that summary

---

[9]To the extent Plaintiff could be considered the victim of sexual harassment because he witnessed such behavior, he still fails to show that the conduct was unlawful because he has not shown that it was so severe and pervasive that it altered the conditions of his employment.

judgment be granted as to this claim.

    **C.**    **Retaliation for Reporting "shareholder fraud, faulty numbers and predatory lending"**

Plaintiff alleges that, On May 1, 2007, he reported John Acee and Frankie Atwater for manipulating the rep power sales rotation line.  Complaint p. 5.  He also alleges that he reported Wyndham Shareholder fraud to the Exit Team Manager (Zorro G.).  Id.  He also appears to allege that he reported to Steve Coen additional violations of company policy by Rich and Dwight on April 30, 2008.  Id. at p. 6.  He alleges that he reported Rich to Wyndham HR and superiors for switching tour planners and manipulating the power line and be back list.  Id. at p. 7.

As noted above in footnote seven, the SOA protects employees who work for publicly-traded companies from retaliation for reporting alleged violations of mail, wire, bank or securities fraud; violations of rules or regulations of the Securities and Exchange Commissions; or federal laws relating to fraud against shareholders. 18 U.S.C. § 1514A(a).  This court does not have subject-matter jurisdiction over this claim because Plaintiff has failed to exhaust his administrative remedies. The SOA requires that a person who alleges retaliation in violation of SOA must first file a complaint with the Secretary of Labor and cannot file an action in district court until 180 days has lapsed from the filing of the complaint with the Department of Labor. 18 U.S.C. § 1514A(b)(1)(A) and (B). Plaintiff filed a complaint with the Department of Labor on January 1, 2009. He then filed this present action on March 6, 2009, only sixty-four days after filing the complaint with the Department of Labor. Because Plaintiff filed this claim in district court prior to the expiration of the 180-day investigative period, this court does not have subject matter jurisdiction over Plaintiff's SOA claim. See Murray v. TXU Corp., 279 F. Supp. 2d 799 (N.D. Tex. 2003) ("Federal district court lacks jurisdiction over suit brought under 18 U.S.C. § 1514A where . . . plaintiff files suit in federal

-23-

district court less than 180 days after filing such complaint. . . .").  Accordingly, dismissal of this

claim is appropriate.[10]

## V.    CONCLUSION

For the reasons discussed above, it is recommended that Plaintiff's Motions for Summary

Judgment (Documents # 64, 90) be denied, Defendants' Motion for Summary Judgment (Document

# 69) be granted and this case be dismissed in its entirety.[11]


s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

February 7, 2011
Florence, South Carolina

**The parties are directed to the important notice on the following page.**

---

[10]Furthermore, relief is unavailable to Plaintiff under the SOA because Plaintiff did not work for a publicly traded company.  Although Plaintiff claims his employer was Wyndham Worldwide Corporation (WWC), which is a publicly-traded company, he has failed to present sufficient evidence to support this claim. Plaintiff's Offer Letter was from WVR, the Salespersons Agreement he signed was with WVR, and the employee handbook is for Wyndham Vacation Ownership, which is one of the trade names for WVR. Pl. Dep., Exs. 7, 8, and 13.

Subsidiaries of publicly-traded companies are not referred to in the SOA and the only court within this Circuit that has addressed this issue is the United States District Court for the District of Maryland in <u>Malin v. Siemens Medical Solutions Health Services</u>, 638 F.Supp.2d 492 (D. Md. 2008). There the court held that unless the plaintiff could establish that the subsidiary company acted as an agent to the parent company with respect to employment matters in general or the alleged retaliatory conduct in particular, the subsidiary would not be subject to SOA. <u>Id.</u> at 500-01 (citing <u>Rao v. Daimler Chrysler Corp.</u>, 2007 WL 1424220 (E.D.Mich. May 14, 2007)). Accordingly, because Plaintiff fails to show that he is an employee of WWC or that WVR acted as an agent to WWC with respect to employment matters in general or the alleged retaliatory conduct, Plaintiff's claim under SOA also fails for this reason.

[11]If the district judge accepts this recommendation, all other pending motions will be moot.

-24-